IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:04CV00183 |
| CIRCUIT CITY STORES, INC., Defendant. | ) ) ) ) | |

MEMORANDUM OPINION

TILLEY, Chief Judge

This case arises out of Defendant Circuit City, Inc.'s ("Circuit City") employment of Olujimi Moses. Plaintiff Equal Employment Opportunity Commission ("EEOC") alleges that from July 2000 to August 15, 2001, Circuit City subjected Mr. Moses to a hostile work environment based on his disability in violation of the Americans with Disabilities Act ("ADA"). The case is now before the Court on Defendant's Motion for Summary Judgment [Doc. #33]. For the reasons discussed below, this motion will be DENIED.

I.

The facts of this case in the light most favorable to the Plaintiff are as follows. In 1997, Mr. Moses was hired by Circuit City as a stereo installer. From early 1999 until his termination in September 2001, Mr. Moses was a part-time sales associate in the Roadshop, the part of the Circuit City store that sells mobile audio equipment. Mr. Moses was compensated solely by commission on sales he

made and he received no paid benefits from Circuit City. As a sales associate, Mr. Moses's immediate supervisor was Roadshop Manager John Bradley. Douglass Scott, who was Store Manager beginning in June 2000, also supervised sales associates.

Mr. Moses has suffered from sickle cell anemia since birth. As a result of this disease, Mr. Moses experiences daily pain and periodic "crises" of varying severity. A "moderate" crisis requires him to be bedridden, while a "severe" crisis results in complete debilitation and hospitalization. During 2000 and 2001, Mr. Moses was experiencing moderate crises approximately once per week and severe crises as often as several times per month. Also as a result of the sickle cell anemia, Mr. Moses suffers from avascular necrosis, a condition affecting the bone tissue that has caused him to undergo several surgeries on his left hip. During the period at issue, Mr. Moses walked with a crutch or crutches to alleviate his daily pain.

Mr. Moses was sometimes unable to attend work due to the moderate and severe crises and could not work long shifts because overexertion would cause him to become sick. Mr. Moses was "permitted to work when [he] was able," and a schedule was made up based on the days he told Mr. Bradley he could work. (Moses Aff. ¶ 8; Bradley Dep. at 127-128.) Even with a modified schedule, there were times that Mr. Moses was not able to come to work on the days he had scheduled. Mr. Bradley talked with Mr. Moses about calling or having someone

2

else call in when he was not going to make it to work, so that other sales associates would not have to stay beyond their shifts to cover the sales floor. After that conversation, Mr. Bradley still did not always receive notification when Mr. Moses was unable to work. After talking with District Manager Chris McCollum, Mr. Bradley decided to schedule enough other salespeople to cover the sales floor on days Mr. Moses was scheduled to work, so that if Mr. Moses was unable to work customer service on the floor would not suffer.

Shortly after Doug Scott became Store Manager in June 2000, and continuing through Mr. Moses's employment at Circuit City, Mr. Scott made comments to and about Mr. Moses relating to Mr. Moses's disability. On the day Mr. Moses met Mr. Scott in July 2000 Mr. Scott said, "What is Circuit City doing hiring crippled people?" and told Mr. Moses he should "get a wheelchair, take it back to the [R]oadshop, get some stereo and speakers installed. Maybe we could hire somebody to push you around. You should be able to sell stuff because people would have sympathy for you." (Moses Dep. at 195-96.) Mr. Moses was offended by these comments and asked Mr. Scott not to joke about his health. On more than one occasion, however, Mr. Scott referred to Mr. Moses as "hoppy" and "crip," sometimes in front of other employees. (Moses Dep. at 117-19.) He also told Mr. Moses, "this is not a Red Cross, that if [his] legs are hurting so bad, [he] should find another place to work." (Id. at 118-19.) Mr. Scott commented several times about Mr. Moses needing a wheelchair, and complained about a chair that

3

Mr. Bradley had placed on the sales floor for Mr. Moses's use. According to Mr. Moses, Mr. Scott made a remark about his physical impairment "almost every time" the two worked together.[1] (Moses Aff. ¶ 9.) These remarks were very upsetting to Mr. Moses and made it difficult for him to work.

In addition to these statements, Mr. Scott also made comments about Mr. Moses outside of his presence. He referred to Mr. Moses as "hoppy" and "crippled" to other employees. In front of the sales associates at a morning meeting, he made fun of Mr. Moses's low sales numbers and resulting low earnings. In another meeting, when an employee told Mr. Scott that Mr. Moses was in the hospital that day, Mr. Scott responded that Circuit City was not the Red Cross. Mr. Scott said to a group of Mr. Moses's coworkers that they should buy Mr. Moses a wheelchair to make him more "useful." (Hall Dep. at 75-76.) Mr. Moses's coworkers relayed to Mr. Moses many of the comments Mr. Scott made outside his presence.

Several employees also related Mr. Scott's comments to Mr. Bradley and expressed their discomfort with Mr. Scott's treatment of Mr. Moses; Mr. Bradley

---

[1] It is not clear how often Mr. Moses and Mr. Scott worked the same shift. Based on their schedules, it could have been as often as once per week. (See Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. at 4 n.4.) Defendant argues that Mr. Moses worked seventy-three days during the more than 400-day period he and Mr. Scott were both employed by Circuit City in Durham. (Def.'s Mem. Supp. Mot. Summ. J. at 5.) Neither party, however, has proffered evidence of a formal attendance policy or of the days Mr. Moses was scheduled to work compared to the days he did work.

4

told them to discuss their concerns with the Human Resources department. One employee also expressed his concern directly to Mr. Scott, and told him it was not appropriate to call Mr. Moses names. Mr. Scott told him to "lighten up." (McCrea Dep. at 29.) Mr. Moses's coworkers noticed that Mr. Scott's comments upset Mr. Moses and sometimes discussed the issue with him. Two coworkers testified that they believed Mr. Scott's treatment of Mr. Moses was unfair and that Mr. Moses was justified if he was upset by it.[2]

In addition to asking Mr. Scott not to make comments about his disability, Mr. Moses discussed his concerns about Mr. Scott's behavior with his supervisor Mr. Bradley and with the Human Resources department. He told Mr. Bradley that Mr. Scott called him "hoppy" and "crip," and had made fun of his low earnings. (Moses Dep. at 123.) Mr. Moses also informed Mr. Bradley of Mr. Scott's statement about getting a wheelchair with speakers. Mr. Bradley told Mr. Moses to contact Human Resources, which Mr. Moses did. A representative from Human Resources later spoke with Mr. Bradley about the wheelchair complaint.

Mr. Moses spoke to personnel manager Lorraine Fleming Sizemore at least five times. Although it is not clear whether harassment was discussed in each of those conversations, Mr. Moses did tell Ms. Sizemore that he was being harassed and comments were being made about him because of his disability. In addition,

---

[2] While the parties have not questioned the admissibility of this evidence, it is possible that it may be admissible with regard to the objective component discussed in Section III.B., infra.

5

he spoke with at least one other individual in the Human Resources department about Mr. Scott's behavior, but again there was no action taken. Mr. Moses also made calls about Mr. Scott's conduct to the hotline telephone number Circuit City employees could call with complaints. Although he left messages, his calls were not returned. Mr. Scott was not disciplined or "coached" regarding his behavior towards Mr. Moses, and no corrective action was taken against him.[3] Ms. Sizemore interviewed Mr. Scott once, after one of the morning meeting incidents, but after that interview the issue "went away" according to Mr. Scott. His remarks relating to Mr. Moses's disability continued through August 15, 2001. Mr. Moses was terminated in September 2001.[4]

II.

In considering a motion for summary judgment, the facts and inferences reasonably drawn therefrom must be considered in the light most favorable to the non-moving party, in this case the EEOC. Fed. R. Civ. P. 56(e). Summary judgment will be granted only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Id.; Celotex Corp. v.

---

[3] "Coaching" was the formal discipline process that would have resulted in a written assessment being placed in the employee's file.

[4] Defendant states that Mr. Moses was terminated because he did not attend certain meetings. Mr. Moses testified that he was not aware that the meetings had been scheduled. Because the period at issue for purposes of the hostile environment claim is July 2000 to August 15, 2001, and because the EEOC is not alleging wrongful termination, the facts surrounding Mr. Moses's termination in September are not relevant to the instant motion.

6

Catrett, 477 U.S. 317, 322 (1986). A material fact is a fact whose existence could cause a reasonable jury to reach a different outcome. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Cox v. County of Prince William, 249 F.3d 295, 299 (4th Cir. 2001). A genuine issue exists if the evidence is such that a reasonable jury could find in favor of the nonmoving party. Anderson, 477 U.S. at 248. If the nonmoving party has not made a sufficient showing on an essential element of its case on which it would have the burden of proof at trial, then no genuine issue of material fact exists and summary judgment is appropriate. Celotex, 477 U.S. at 322-23.

III.

In order to make out a claim for hostile work environment harassment under the ADA, a plaintiff must show that

> (1) he is a qualified individual with a disability; (2) he was subjected to unwelcome harassment; (3) the harassment was based on his disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability for the harassment to the employer.

Fox v. Gen. Motors Corp., 247 F.3d 169, 177 (4th Cir. 2001). Only the first, fourth, and fifth elements are at issue for purposes of this motion for summary judgment.

A.

Circuit City asserts that the EEOC has not proffered sufficient, properly authenticated evidence with regard to the first element, whether Mr. Moses was a

7

qualified individual. It is not disputed that Mr. Moses is disabled as the ADA defines that term. Rather, at issue is whether he was "qualified" for the position he held. A qualified individual with a disability is one who, "with or without reasonable accommodation, can perform the essential functions of the employment position" he holds. 42 U.S.C. § 12111(8) (2005). Circuit City argues that regular attendance was an essential function of Mr. Moses's position, and that he did not perform that function. There is sufficient evidence for a reasonable jury to find that Mr. Moses was qualified for his job.

1.

The Fourth Circuit has noted that "a regular and reliable level of attendance is a necessary element of most jobs." Tyndall v. Nat'l Educ. Ctrs., Inc., 31 F.3d 209, 213 (4th Cir. 1994), construed in Rohan v. Networks Presentations LLC, 375 F.3d 266, 279 (4th Cir. 2004) ("[P]laintiff [in Tyndall] failed to perform essential function of attendance because her absences made her incapable of fulfilling her teaching obligations."). The employer's judgment about what functions of the job are essential will be given consideration. Id.; see also 29 C.F.R. 1630.2(n)(3)(i) (2005). The consequences of not performing a function may also be considered as evidence of whether a function is essential. 29 C.F.R. 1630.2(n)(3)(iv).

A reasonable jury could find that regular attendance was not an essential function of Mr. Moses's position. Regular attendance is not an essential function of all jobs, and the only essential functions relevant to this case are those of Mr.

8

Moses's job.  Cf. Tyndall, 31 F.3d at 213 ("An employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA.").  There is no evidence of a formal Circuit City policy regarding absences or of a written description of Mr. Moses's position describing a certain level of attendance as a necessary element of the job.  Nor are there any records that Mr. Moses was ever disciplined for attendance problems.  Circuit City's behavior therefore does not indicate that it considered regular attendance an essential function of Mr. Moses's position.  A reasonable jury could therefore conclude that it was not an essential function.[5]

2.

Even if regular attendance was an essential function of Mr. Moses's position, the evidence is such that a reasonable jury could find that Mr. Moses was performing that function.  The Fourth Circuit in Rohan v. Networks Presentations, 375 F.3d 266, explored what it means to "perform" an essential function.  In Rohan, the Court assumed without deciding that "interacting with others" was an essential function of the plaintiff's position as an actress.  375 F.3d at 279.  The parties agreed that Ms. Rohan could interact with others "to some extent":

---

[5] It is noted that there could be evidence at trial that Mr. Moses's attendance problems had negative consequences for Circuit City as a business. Such evidence would be relevant in considering whether attendance was an essential function of the position.  29 C.F.R. 1630.2(n)(3)(iv) ("Evidence of whether a particular function is essential includes. . . [t]he consequences of not requiring the incumbent to perform the function[.]").  However, such evidence is not now before the Court.

9

> [T]he question [was] whether her problems interacting with others rose to a level that made her unable to "perform" this essential function within the meaning of the ADA. When the question is thus a matter of degree, our case law suggests that a plaintiff fails to perform the essential function only if her failure detrimentally affects the purpose of the employment.

Id. An individual therefore need not carry out an essential function flawlessly in order to "perform" the function within the meaning of the ADA. If attendance was an essential function of Mr. Moses's position, and if he did have difficulty attending work as often as he was scheduled to, then he was nevertheless performing that essential function so long as any attendance problems did not detrimentally affect the purpose of his employment. There is no evidence of how many days Mr. Moses was scheduled to work but did not.[6] Again, the fact that Circuit City did not discipline him for absenteeism suggests that his alleged attendance problems did not detrimentally affect the purpose of his employment as Circuit City conceived it. A jury could find based on the uncontroverted evidence before the Court that Mr. Moses's alleged attendance problems did not have a detrimental effect on the purpose of his employment.

For the two distinct reasons that a reasonable jury could find (1) that regular attendance was not an essential function of Mr. Moses's position or (2) that if

---

[6] The Court also notes that Circuit City has not alleged or presented any evidence that Mr. Moses was absent from work for reasons other than his health. In that sense, this case is distinguishable from Tyndall, in which the Fourth Circuit noted in finding that Ms. Tyndall failed to perform the essential function of attendance that the majority of her absences were unrelated to her disability. 31 F.3d at 214.

10

regular attendance was an essential function Mr. Moses performed that function within the meaning of the ADA, Circuit City is not entitled to summary judgment based on Mr. Moses's status as a qualified individual.

B.

In making out a claim for hostile environment, a plaintiff must show that "the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment." Fox, 247 F.3d at 177. The environment must be both subjectively and objectively hostile. A work environment is subjectively hostile if the plaintiff perceived it as hostile and objectively hostile if a reasonable person would have so perceived it. Id. A hostile environment claim must be evaluated based on the "totality of the circumstances." Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir. 2001).[7] Factors that may be considered include, but are not limited to, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Systems, Inc. 510 U.S. 17, 23 (1993).

Plaintiff has presented evidence on which a reasonable jury could find that Mr. Moses was subjected to severe and pervasive harassment. Mr. Scott's comments were frequent, severe, and physically humiliating. Although it is not

---

[7] Because the ADA's goals and structure are similar to Title VII, Title VII precedent is often employed in analyzing ADA claims. Fox, 247 F.3d at 176.

11

clear how often Mr. Scott and Mr. Moses worked together, the evidence suggests that even if they were not working the same shift, the two could have been at the store at the same time when one was going off of a shift and the other was coming on.[8] In any case, Mr. Moses testified that almost every time he worked around Mr. Scott, who was the store's manager, he experienced harassment that made it difficult for him to work. Mr. Scott's comments often caused him to become visibly upset while at work. Finally, Mr. Moses complained about Mr. Scott's behavior to his coworkers, to Mr. Bradley, and to individuals in Human Resources. Mr. Moses's testimony reveals that he found the environment subjectively hostile. The evidence is also such that a reasonable jury could find that the environment was objectively hostile, that is, that a reasonable person in Mr. Moses's position would have found it hostile. Mr. Scott's comments were severe and frequent enough that other employees were concerned about Mr. Moses and voiced those concerns to Moses, Bradley, and Scott himself. EEOC has raised a genuine issue of material fact on this element of the prima facie case.

C.

As for the final element of the prima facie case for hostile environment, an

---

[8] Plaintiff also notes that Mr. Moses sometimes saw Mr. Scott when he was visiting the store outside of his work hours. Defendant argues that the fact that Mr. Moses "hung out" at the store even when not scheduled to work is evidence that the environment was not subjectively hostile. This is evidence that may be weighed by the factfinder at trial, but is not grounds for judgment in favor of defendant at this stage.

12

employer is liable to an employee for an actionable hostile environment created by someone with supervisory authority over the employee. Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998). When no tangible, adverse employment action is taken, the employer can assert a defense to liability "subject to proof by a preponderance of the evidence" of two elements: (1)"the employer exercised reasonable care to prevent and correct promptly any. . . harassing behavior," and (2) "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Id. at 807-08; Burlington Indus. v. Ellerth, 524 U.S. 742, 765 (1998) [hereinafter Ellerth].

The fact that an employer has instituted and maintains an "anti-harassment policy and an adequate complaint procedure" is relevant in establishing the first element of the defense. Brown v. Perry, 184 F.3d 388, 395 (4th Cir. 1999). At the same time, however, "mere promulgation of such a policy may well fail to satisfy the employer's burden. The employer must act reasonably, and thus any policy adopted by the employer must be both reasonably designed and reasonably effectual." Id. at 396. Therefore, if the policy is "defective or dysfunctional" or if the employer's investigations of an employee's complaints are inadequate, the policy will no longer "militate strongly" in favor of a finding that the first element has been satisfied. Id.; see Smith v. First Union National Bank, 202 F.3d 234, 245 (4th Cir. 2000) (reversing summary judgment in favor of employer where policy

13

was defective and investigations were inadequate).

The second element a defendant must prove in order to make out the defense under Faragher and Ellerth is the employee's failure to take advantage of employer-provided corrective opportunities or otherwise to avoid harm. Faragher, 524 U.S. at 807-08; Ellerth, 524 U.S. at 765. In order to advance the policies behind federal anti-discrimination statutes, employees who suffer from discrimination must report the discriminatory behavior; "[o]therwise, the harasser's conduct would continue, perhaps leading other employees to infer that such behavior is acceptable in the workplace." Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 269 (4th Cir. 2001). Evidence that a plaintiff did not use the complaint procedures set up by the employer will normally satisfy the burden on the second element. Id.

Mr. Scott had supervisory authority over Mr. Moses, and therefore any liability would be imputed to Circuit City unless it could prove the defense under Faragher and Ellerth. Circuit City has not forecast evidence on which a reasonable jury could find that this defense has been made out. Mr. Moses took advantage of more than one of the various avenues afforded to him by Circuit City's own policies. He made calls about Mr. Scott's behavior to multiple individuals in Human Resources. He also made calls to the hotline Circuit City had established for employee complaints. Circuit City has not shown that Mr. Moses unreasonably failed to take advantage of those resources or otherwise avoid harm.

14

Furthermore, although Circuit City had an anti-discrimination policy, Circuit City did not act reasonably in enforcing this policy. See Smith, 202 F.3d at 245 ("[Employer's] investigations of [employee's] complaints was inadequate."); Brown, 184 F.3d at 396 ("The employer must act reasonably. . . ."). Circuit City did not investigate thoroughly Mr. Moses's complaints, and several of his calls received no response at all. According to Circuit City's own policy, Mr. Bradley should have reported any complaints about harassment to Human Resources, and all of Mr. Moses's calls should have received immediate responses. (Dep. Exs. 9 & 10.) Mr. Scott testified he recalls being interviewed once in relation to a comment he made during a sales associate meeting, but no action was taken as a result of that. Mr. Scott was never disciplined or "coached" as a result of his behavior towards Mr. Moses. Circuit City has not shown that it would meet the burden it would carry at trial in presenting this defense, and is not entitled to summary judgment on that basis.

IV.

Because the EEOC has raised a genuine issue of material fact with regard to the elements it would have to prove at trial, including (1) Mr. Moses's status as a qualified individual with a disability, (2) the existence of a hostile environment during his employment with Circuit City, and (3) grounds for imputing liability for the hostile environment to Circuit City; and because Circuit City has not made out an affirmative defense to the claims against it, summary judgment will not be

15

granted.  Defendant's Motion for Summary Judgment [Doc. #33] will therefore be DENIED.

This the day of June 21, 2005

                                                  /s/ N. Carlton Tilley, Jr.
                                                  United States District Judge